**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

FEB 29 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| DENNIS LINTHICUM; BRIAN J. BOQUIST; | No. 23-4292 |
| Plaintiffs - Appellants, | D.C. No. 6:23-cv-01624-AA |
| REJEANA JACKSON; KLAMATH COUNTY REPUBLICAN CENTRAL COMMITTEE; JOHN SWANSON; POLK COUNTY REPUBLICAN CENTRAL COMMITTEE; CEDRIC HAYDEN; JOHN LARGE; LANE COUNTY REPUBLICAN CENTRAL COMMITTEE, | OPINION |
| Plaintiffs, | |
| v. | |
| ROB WAGNER, Oregon Senate President, individually and in his official capacity; LAVONNE GRIFFIN-VALADE, Oregon Secretary of State, in her official capacity, | |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the District of Oregon
Ann Aiken, District Judge, Presiding

Argued and Submitted February 9, 2024
Portland, Oregon

Before: Ronald M. Gould, Jay S. Bybee, and Daniel A. Bress, Circuit Judges.

PER CURIAM:
Concurrence by Judge BYBEE; Concurrence by Judge BRESS

Actions have consequences. When those actions might be described as expressive in nature, the First Amendment sometimes protects us from the repercussions that follow. This is not one of those instances. A recent amendment to Oregon's Constitution disqualifies from the next election any state senator or representative who has accrued ten or more unexcused absences from legislative floor sessions. In 2023, State Senators Dennis Linthicum and Brian Boquist engaged in a legislative walkout spanning several weeks, each accumulating more than ten unexcused absences. Oregon's Secretary of State disqualified them from appearing on the ballot for the 2024 election. The Senators seek a preliminary injunction, arguing that they should not face the consequences of their walkout under the Oregon Constitution because their absences constituted a protest protected by the First Amendment to the U.S. Constitution. Under *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011), we must disagree. We affirm the district court's denial of a preliminary injunction.

## I.  BACKGROUND

The Oregon Constitution creates a Legislative Assembly consisting of a Senate and a House of Representatives. Or. Const. art. IV, § 1. The Senate has thirty members; the House, sixty. *Id.* art. IV, § 2; *see* Or. Rev. Stats. § 188.305. The

Legislative Assembly is considered part-time because it meets annually, but for a limited number of days. Subject to certain exceptions, in odd-numbered years the Legislative Assembly meets for no more than 160 days; in even-numbered years, for no more than thirty-five days. Or. Const. art. IV, § 10(1). The members of each house receive a salary for their services "to be established and paid in the same manner as the salaries of other elected state officers and employees." *Id.* art. IV, § 29; Or. Rev. Stats. § 171.072(1). The Constitution further provides that "[t]wo thirds of each house shall constitute a quorum to do business," although "a smaller number may meet . . . and compel the attendance of absent members." Or. Const. art. IV, § 12. If a house, with a quorum present, fails to organize within the first five days, "the members of the house so failing shall be entitled to no compensation . . . until an organization shall have been effected." *Id.* Any member of either house has "the right to protest, and have his protest, with his reasons for dissent, entered on the journal [of the house]." *Id.* art. IV, § 26; *see also id.* art. IV, § 13 (providing that "[e]ach house shall keep a journal of its proceedings"). And, "except for treason, felony, or breaches of the peace," the members are not subject to arrest during a legislative session and may not "be questioned in any other place" "for words uttered in debate in either house." *Id.* art. IV, § 9. "Either house," however, "may punish its members for disorderly behavior," including by expulsion from the house. *Id.* art. IV, § 15.

3

Because of the supermajority quorum requirement, a minority of legislators may preclude legislative business through their absence. Legislative walkouts in Oregon's legislature have become increasingly common in recent years. *See Knopp v. Griffin-Valade*, 372 Or. 1, 4 (2024) (per curiam). In direct response, more than sixty-eight percent of Oregon voters approved Measure 113 in 2022, which amended the "Punishment and expulsion of members" provision of Oregon's Constitution to include the following:

> Failure to attend, without permission or excuse, ten or more legislative floor sessions called to transact business during a regular or special legislative session shall be deemed disorderly behavior and shall disqualify the member from holding office as a Senator or Representative for the term following the election after the member's current term is completed.

Or. Const. art. IV, § 15. Shortly thereafter, the Oregon Senate promulgated rules to implement and enforce the amendment. Senate Rule 3.10(1) provides, in relevant part: "A member shall attend all sessions of the Senate unless excused by the President. A request by a member to be excused from a session shall be in writing. The President shall indicate approval or disapproval of the request in writing."

For the first several months of 2023, Senate President Rob Wagner granted all requests for excusal, including those from Senators Dennis Linthicum and Brian Boquist. The Senators sought and received excusals for weather, home repairs, family obligations, speaking engagements, medical procedures, and undisclosed personal reasons.

But circumstances changed on May 3, 2023, when ten Senators—Senators Linthicum and Boquist among them—staged a walkout. In written excusal requests to Wagner, Senators Linthicum and Boquist explained that they were "protesting the refusal of the Senate to comply" with certain Oregon laws and rules dealing with the readability of legislative summaries. Wagner did not grant their excusal requests. Two days later, Wagner "announced that requests for an excused absence[] on May 6 onward would be granted only in 'extraordinary circumstances.'" He also "revised prior approvals for absences on and following May 6, 2023, and reversed prior approvals for absences due to a family event, a garden show, a family member[']s graduation, and to care for parents." The record indicates that Wagner's strict enforcement of the absence policy applied to members of both parties.

The walkout lasted until late June 2023. During that period, Wagner granted excusal requests from members for life-threatening medical circumstances, a meeting with legislative staff regarding an ethics complaint, and a funeral. He also excused Senator Boquist for two days when a water line burst at the Senator's farm. Wagner denied excusal requests from other Senators, including for visits to family, family health issues, illness, a wedding, and a child's high-school graduation. He also denied repeated requests for excusals from Senators Linthicum and Boquist on the basis of their protest.

All told, Senator Linthicum accrued thirty-two unexcused absences; Senator Boquist accrued thirty. Each Senator had sought, and was denied, more than ten excusals for protest-related reasons. On September 20, 2023, the Oregon Secretary of State determined that Senators Linthicum and Boquist were ineligible to appear on the ballot for the 2024 election because they had each accrued more than ten unexcused absences.

The Senators filed suit under 42 U.S.C. § 1983 in the U.S. District Court for the District of Oregon, alleging violations of the First and Fourteenth Amendments.[1] They also moved for a preliminary injunction, seeking to enjoin the Secretary of State from disqualifying them from the 2024 election. In their motion for preliminary injunctive relief, the Senators made only a First Amendment retaliation claim.

The district court denied the motion for a preliminary injunction. Most relevantly, the court reasoned that under *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011), the First Amendment does not protect an exercise of official legislative power—here, the "exercise of . . . official power . . . meant to deprive the

---

[1] Five Senators, including Senator Linthicum, also brought a challenge in state court to the Secretary of State's rules interpreting the amendment to Article IV, § 15. Those Senators argued that the new amendment disqualified them for the term after the next term of office. The Secretary's rule disqualified the members for the next term after their absences. On February 1, 2024, the Oregon Supreme Court upheld the Secretary of State's rule and decision to exclude the Senators from future ballots. *See generally Knopp*, 372 Or. 1.

legislature of the power to conduct business"—even if that exercise of power might otherwise be characterized as expressive. The district court reasoned that "the use of legislative walkouts is not constitutionally protected activity for purposes of the Free Speech Clause of the First Amendment." The court therefore concluded that the Senators had not established a likelihood of success on the merits and were not entitled to a preliminary injunction that would place them on the 2024 ballot.

The Senators timely appealed.

## II. STANDARDS OF REVIEW

The Senators appeal the denial of a preliminary injunction, which we review for abuse of discretion. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). "The appropriate legal standard to analyze a preliminary injunction motion requires a district court to determine whether a movant has established that (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Id.*; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

This appeal principally concerns whether the Senators have established a likelihood of success on the merits, which is the most important preliminary injunction factor. *See Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).

## III.  DISCUSSION

The Senators here mount a claim of First Amendment retaliation.  "[T]he First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech."  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted).  When an elected official brings an action for First Amendment retaliation, he bears the burden of proving that "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant . . . ; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action."  *Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022) (citation omitted).  If the plaintiff official makes a prima facie showing, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of."  *Id.* at 778 (citation omitted).

The Senators' argument falters at the outset because they cannot show that their walkout was constitutionally protected activity.  We agree with the district court that not attending legislative sessions—depriving a legislature of the quorum required to consider legislative action (or risking that result)—is "an exercise of the power of the legislator's office" and therefore is not activity protected under the First Amendment.  In reaching that conclusion, the district court relied soundly on the

Supreme Court's reasoning in *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011).

*Carrigan* involved a Nevada state law that prohibited legislators from voting on legislative matters in which they were privately interested. *Id.* at 119–20. The Supreme Court concluded that the rule did not run afoul of the First Amendment because "a legislator has no right to use official powers for expressive purposes." *Id.* at 127. Voting in legislative meetings, the Court explained, is "the commitment of [the legislator's] apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Id.* at 125–26. Because "[t]he legislative power thus committed is not personal to the legislator but belongs to the people," *id.* at 126, Nevada's rule did not infringe any personal right of the legislators guaranteed by the First Amendment. Even if legislative voting were expressive, and "even if the actor would like it to *convey* his deeply held personal belief," that fact "does not transform action into First Amendment speech." *Id.* at 127. The Court thus explicitly "rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message." *Id.*

The Senators resist *Carrigan*'s application here, arguing the lack of First Amendment protection recognized in that case extends only to a narrow concept of legislative power, limited "specifically and narrowly to 'procedures for voting in legislative assemblies . . . .'" We disagree. Voting may be the quintessential

exercise of the legislator's "apportioned share of the legislature's power," but it is not the only one. *Id.* at 125. Under *Carrigan*, any official action in the legislature that tends to "the passage or defeat of a particular proposal," is properly understood as a prerogative of membership in that body. *Id.* at 125–26. No private citizen enjoys the privilege to advance or frustrate legislative action directly in the legislature. The ability to stymie legislation by absenting oneself from a meeting of the Oregon Senate belongs to Senators alone. The use of that power therefore implicates the "governmental mechanics" of the legislative process, and *Carrigan* makes clear that a legislator "has no right" under the First Amendment to use that official power "for expressive purposes." *Id.* at 127. The Senators attempt to claim a personal First Amendment right to walk out, but *Carrigan* is clear that "[t]he legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id.* at 126. We accordingly reject the Senators' claim that their walkout is anything other than an exercise of legislative power.[2]

---

[2] The Senators also appear to argue that *Carrigan* does not apply by distinguishing between affirmative actions, such as "considering and voting upon bills," and negative actions, such as "walking out to deny a majority or a quorum." The Senators claim the former are legislative while the latter are not. This distinction is unpersuasive. First, it ignores the fact that a vote can itself be negative; a "no" vote does not make law but attempts to prevent law from being made. Second, as explained above, the *Carrigan* Court defined legislative power much more broadly, including all governmental acts that aid "the passage *or defeat* of a particular proposal." *Id.* at 125–26 (emphasis added).

*Carrigan* also instructs us that history can be relevant to determining whether certain activity is protected by the First Amendment. "[A] universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional . . . ." *See id.* at 122 (alteration in original) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)). In concluding that Nevada's law passed constitutional muster, *Carrigan* relied on the fact that "such rules have been commonplace for over 200 years." *Id.*; *see also id.* at 133 (Alito, J., concurring in part and concurring in the judgment).

In this case, the historical tradition of legislatures retaining the power to physically compel absent members to attend legislative sessions bolsters our conclusion that the Senators' walkout is not protected First Amendment expression. At the federal level, the Constitution sets a majority of the members of each house of Congress as a quorum and authorizes each house "to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." U.S. Const. art. I, § 5, cl. 1. Each house also has the power to "punish its Members for disorderly Behaviour . . . ." *Id.* art. I, § 5, cl. 2. In fact, the Supreme Court has long upheld the power of each house of Congress to imprison its members to compel their presence:

> As we have already said, the Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment may in a proper case be

imprisonment, and that it may be for refusal to obey some rule on that
subject made by the House for the preservation of order.

     So, also, the penalty which each House is authorized to inflict in
order to compel the attendance of absent members may be
imprisonment, and this may be for a violation of some order or standing
rule on that subject.

*Kilbourn v. Thompson*, 103 U.S. 168, 189–90 (1880). Today, House Rule XX

provides that a majority of at least fifteen members "may order the Sergeant-at-Arms

to send officers appointed by the Sergeant-at-Arms to arrest those Members for

whom no sufficient excuse is made and shall secure and retain their attendance."

House Rule XX, cl. 5(b). The Senate's rules are comparable. *See* Senate Rule VI,

cl. 4. Each house may exercise its powers under these rules to compel the attendance

of absent members. Oregon's Constitution contains a similar provisions. *See* Or.

Const. art. IV, § 12. Although the provision we consider in Article IV, § 15 of the

Oregon Constitution involves a different incentive for legislative attendance—the

threat of disqualification—the historical tradition of the compulsion power confirms

that legislators have no underlying personal First Amendment right not to be present

in the legislature for official legislative business. *See Carrigan*, 564 U.S. at 122.

    Our decision in *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) does not

direct a different result here. In *Boquist*, we concluded that a district court erred in

dismissing a claim brought by Senator Boquist—who is also a plaintiff in this case—

challenging an Oregon Senate Special Committee policy, adopted by those in the

opposite political party, which required that Boquist provide 12 hours' advance

notice of his intent to enter the State Capitol. *Id.* at 772–73. This rule was imposed after Boquist made statements on the Senate floor and to a reporter, statements that other Senators claimed were threatening. *Id.* at 773. We held that the complaint raised "a plausible inference" that Senator Boquist's statements were protected speech. *Id.* at 780.

*Boquist* was a very different case. Senator Boquist there was not exercising the "legislative power" as *Carrigan* conceived it; he was making statements, including to a reporter, not engaging in a "governmental act." *Carrigan*, 564 U.S. at 128. Indeed, *Carrigan* drew a distinction between the First Amendment's lack of protection for a legislator engaging in "a governmental act" or using "governmental mechanics" of the legislative process, and the personal rights of legislators to engage in speech. *Id.* at 127. As *Carrigan* noted, "[a] legislator voting on a bill is not fairly analogized to one simply discussing that bill or expressing an opinion for or against it. The former is performing a governmental act as a representative of his constituents; only the latter is exercising personal First Amendment rights." *Id.* at 128 n.5 (internal citation omitted).[3]

---

[3] We also note that the 12-hour notice rule at issue in *Boquist*, which "bar[red] an elected official from the legislative chamber," was both historically unsupported and directly contrary to the effect of the Oregon rule here, which seeks to incentivize legislators to be present for legislative sessions. 32 F.4th at 782. This case is further unlike *Boquist* because there is no indication in the record that the Senate President failed to excuse the Senators' absences because of the content of their putative

We think, for the reasons already given, that the walkout here is more clearly analogous to the voting in *Carrigan* than the personal speech at issue in *Boquist*.  We therefore hold that walkouts by legislators to deny a quorum to conduct business in the legislature are exercises of legislative power not protected under the First Amendment under the Supreme Court's decision in *Carrigan*.  We thus reject the Senators' claim and further hold that the First Amendment does not protect the Senators from the application of Article IV, § 15 of the Oregon Constitution.

IV.  CONCLUSION

We conclude that the Senators are unlikely to prevail on the merits of their First Amendment retaliation claim.  Although we need not proceed to analyze the remaining preliminary injunction factors, it should be clear from the foregoing that we perceive no legal or factual error in the district court's analysis and therefore find no abuse of discretion.  We affirm the district court's denial of a preliminary injunction.

**AFFIRMED.**

-------------------

expressive conduct.  In fact, the Senate President declined to excuse most requests for absences from all Senators, regardless of party.  Senators Boquist and Linthicum were the only Senators disqualified from running in the 2024 election, not because of their party affiliation or expression, but because they were the only Senators seeking re-election who accrued ten or more absences.

FILED

FEB 29 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BYBEE, Circuit Judge, concurring:

Our per curiam opinion correctly explains why the Senators are unlikely to succeed in asserting a First Amendment retaliation claim based on their inability to use legislative office to further the expression of their personal views. I concur in that opinion in full.

I write separately to respond to a distinct component of the Senators' First Amendment argument. In their briefs and at oral argument, the Senators claimed that they were asserting only their *personal* right to free speech. That is, the Senators claimed that they were seeking to vindicate only the same First Amendment rights held by all citizens. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("[P]ublic employees do not surrender all their First Amendment rights by reason of their employment."); *Huppert v. City of Pittsburg*, 574 F.3d 696, 702 (9th Cir. 2009). They disavowed claiming any First Amendment right to speak based on their status as legislators. The reason for this strategic decision is obvious: *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011), answers any claim to a special First Amendment right to speak in a legislative capacity. The per curiam opinion fully explains why any such claim fails under *Carrigan*. But because the Senators invoked in no uncertain terms a personal right to protest, I feel obligated to explain why the argument the Senators tried to make fails under the First Amendment. And

in so doing, I endeavor to show why—despite their protestations—the Senators are in truth asserting a legislative right.

I first describe why the First Amendment does not cabin the government's ability to burden speech incidentally in the pursuit of valid objectives. I then set out why, even assuming there is some expressive value in the Senators' walkouts, Oregon's disqualification-provision satisfies our precedents on content neutrality.

I

The freedom of speech protected by the First Amendment, although colloquially denominated a right, is better characterized as a privilege or an immunity.[1]  We enjoy a privilege to speak freely, including the privilege of criticizing our elected officials, and the government has no right to suppress our criticism.  Stated alternatively, our speech is generally immune from government regulation because the government is disabled by the First Amendment.  The First Amendment deprives the government of power to suppress our speech.  "[W]e must recall that the exact wording of the First Amendment—"*Congress shall make no law*"—"precisely track[s] and invert[s] the exact wording of the Article I, section 8 necessary-and-proper clause:  '*Congress shall* have power . . . to *make all laws which shall be necessary and proper* . . . .'"  Akhil Reed Amar, *The Bill of Rights* 39

---

[1] The First Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides in relevant part:  "[The States] shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.

(1998); *cf.* Or. Const. art. I, § 8 ("No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of the right."). If there is any question of the scope of the powers conferred on the legislature, the First Amendment makes clear the power to abridge speech is affirmatively withdrawn.[2]

The fact that we have a privilege to speak our minds freely does not confer an unlimited and freewheeling immunity from the consequences of our speech. We do not have the privilege of speaking "whenever and however and wherever [we] please." *Menotti v. City of Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). For that reason, the First Amendment does not withdraw from the government the ability to regulate conduct unrelated to

---

[2] Our First Amendment privilege/immunity to speak our mind is subject to well-known exceptions. *See*, *e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been though to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or fighting words . . . ."). Those exceptions are content-based, but other efforts to suppress speech based on its content must run the gauntlet of strict scrutiny. Our freedom of speech is also subject to certain content-neutral restrictions related to time, place, and manner. *See generally Ward v. Rock Against Racism*, 491 U.S. 781 (1989).

the content of one's expression, even if the regulation "has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). When a law regulates "conduct itself" rather than "the message conveyed by that conduct, the regulation is subject to the lesser scrutiny given to content-neutral restrictions." *United States v. Swisher*, 811 F.3d 299, 312 (9th Cir. 2016) (en banc).

Let's take a simple example. A high school student who works at the drive-through window at McDonald's is not excused from work because she is at a political rally. McDonald's, which is not a state actor subject to the First Amendment, may dismiss her even though she is engaged in constitutionally protected activity. I know of no principle in First Amendment jurisprudence that would shield state employees from similar consequences. If a public school teacher fails to show up for class, she is not excused from work because she is attending the same political rally as her student who works at McDonald's. And it would not make any difference if the rally was in support of better funding for public education, or if the teacher was joined by thousands of other teachers, collectively exercising their First Amendment rights. Public employees who fail to go to work have been subject to injunctions, *see San Diego Tchrs. Ass'n v. Superior Ct. of San Diego*, 593 P.2d 838, 846–47 (Cal. 1979) (in bank) (recognizing the power of California's Public Employment Relations Board to enjoin teacher strikes); *Sch. Dist. No. 351 Oneida*

4

*Cnty. v. Oneida Educ. Ass'n*, 567 P.2d 830, 833 (Idaho 1977) (rejecting a constitutional challenge to an injunction because public school teachers have no right to strike), dismissal, *see Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 495–96 (1976) (affirming the states' power to terminate teachers who strike); *Pro. Air Traffic Controllers Org. v. FLRA*, 685 F.2d 547, 551–552 (D.C. Cir. 1982) (discussing President Reagan's decision to fire 11,000 striking air traffic controllers), and even criminal prosecutions, *see United States v. Taylor*, 693 F.2d 919 (9th Cir. 1988) (upholding the convictions of traffic controllers under 18 U.S.C. § 1918, prohibiting strikes against the federal government).  The First Amendment does not excuse their absences.  *See Aircraft Serv. Int'l., Inc. v. Int'l. Bhd. of Teamsters, AFL CIO Local 117*, 742 F.3d 1110, 1122 (9th Cir. 2014) ("[W]e have been unable to identify any case in the Supreme Court or any of the courts of appeal invalidating a strike injunction . . . because of First Amendment concerns. To the contrary, the Court has consistently found that actions inconsistent with national labor laws are generally not protected by the First Amendment."), *on reh'g en banc sub nom. Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069 (9th Cir. 2015).  The Senators have not offered any reason why they should be treated differently from any other state employee; after all, the Senators themselves claim a personal right, not a right derivative of their elected office.  They have to show up for work just like everyone else.

5

Notwithstanding these principles, the Senators doubled down at oral argument, insisting that they were excused from any attendance-related rules created by the Oregon Constitution or Oregon Senate because they were off exercising their First Amendment rights. Here is where the Senators fundamentally misunderstand the First Amendment. They argue that because they were exercising a free speech right, they were excused from other rules. That is an argument that has been made with respect to the Free Exercise Clause, one that remains controversial. *Compare Emp. Div., Dep't of Hum Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.") *with City of Boerne v. Flores*, 521 U.S. 507, 546 (1997) (O'Connor, J., dissenting) (advocating overruling *Smith* because "the [Free Exercise] Clause is best understood as an affirmative guarantee of the right to participate in religious practices and conduct with impermissible governmental interference, even when such conduct conflicts with a neutral, generally applicable law"); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 545 (2021) (Alito, J., concurring) (expressing the view that *Smith* "is fundamentally wrong and should be corrected"). It is not a proposition that can be sustained under the Free Speech Clause, at least not without showing how the law suppresses constitutionally protected speech. *See Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (noting that persons barred from a public forum may "not

6

return—*regardless* of whether, upon their return, they seek to engage in speech");
*IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) ("[A] law of general applicability does not 'offend the First Amendment simply because [its] enforcement' may have an 'incidental effect[]' on speech." (second and third alterations in original) (citation omitted)). The Senators have made an argument more appropriate if they were trying to preserve their religious rights, rather than their right to free speech.

In the end, the Senators resist these well-settled principles by noting that they are elected officials, not employees. When they do so, they take themselves out of the class of "citizens just like everyone else" and move themselves into the special class of "citizens serving as legislators." That is where *Carrigan* comes in. *Carrigan* involved a Nevada law that required lawmakers to recuse themselves from voting for legislation in which they had a personal interest. But more than that rule was at issue in the case. Nevada's law also precluded lawmakers from "advocat[ing] the passage or failure" of any proposal from which they were recused. *Carrigan*, 564 U.S. at 122. The Supreme Court upheld this rule against a challenge based on recused legislators' personal First Amendment rights. A recused legislator, thus stripped of his ability to vote on the passage of legislation, possesses no more speech rights than any other private citizen. Consequently, although he retains a personal right to comment on the proposed legislation generally, such speech is subject to

7

"reasonable time, place, and manner limitation[s]." *Id.* The Court took for granted that one who does not have a right to vote in the legislature—whether a recused legislator or an ordinary private citizen—may properly be excluded from speaking at legislative sessions because the sessions "would become massive town-hall meetings if those who had a right to speak were not limited to those who had a right to vote." *Id.* at 121. *Carrigan* thus stands for the proposition that a State may incidentally burden the personal First Amendment rights of state legislators when the exercise of such rights would disrupt the functioning of the legislature. The Senators' expressive walkout does not excuse them from the Oregon rules regarding attendance at work.

II

Even if I thought that the Senators' absences were protected expressive conduct, they still could not prevail. Like the ethics rule at issue in *Carrigan*, Oregon's disqualification provision is facially content-neutral.[3] A content-neutral law survives intermediate scrutiny so long as it is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." *Doe v. Harris*, 772 F.3d 563, 576–77 (9th Cir. 2014) (first alteration in original) (quoting *Rock Against Racism*, 491 U.S. at

---

[3] As the per curiam opinion correctly points out, the record is devoid of any suggestion that Article IV, § 15 was applied in a discriminatory fashion based on the content of senators' expression.

8

791).  The Senators wisely do not contest Oregon's considerable interest in ensuring the sound functioning of the state legislature.  They instead focus their challenge on the narrow-tailoring prong.  In particular, they argue that disqualification is more speech-restrictive than necessary because the "Senate could have compelled the return of absent members . . . under Or. Const. art. IV, § 12 (Oregon's 'compulsion of attendance' provision), but chose not to."

The Senators misapprehend structural constitutional principles in general and First Amendment narrow-tailoring analysis in particular.  I address each in turn.

A

The power of States to devise content-neutral rules is at its apex when choosing how to organize their public institutions.  A fundamental precept of our constitutional design is that "States retain broad autonomy in structuring their governments . . . ."  *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543 (2013).  Oregon's Constitution parallels the U.S. Constitution in authorizing legislators to compel the attendance of absent members.  *See* Or. Const. art. IV, § 12; U.S. Const. art. I, § 5, cl. 1.  The Senators' argument, in essence, asks us to impose on all States the federal mechanism by which our national Congress ensures a quorum.  To be sure, Congress's extant attendance rules have worked relatively well.  Because a simple majority is often sufficient to pass legislation, *see* U.S. Const. art. I, § 5, cl. 1, member absence rarely frustrates legislative business.

9

But the design of our national Congress is not the only way to constitute a legislature. Most states define a quorum as a majority of members, but four states—including Oregon—require two-thirds of total members. *See* Ballotpedia, *Noteworthy State Legislative Walkouts* (last accessed Feb. 12, 2024), https://perma.cc/ZX8Z-9MFW. Even among states that generally require only a majority of members for a quorum, some impose a supermajority requirement when voting on certain pieces of legislation. *See*, *e.g.*, Del. Const. art. II, § 19, cl. 1; Nev. Const. art. 4, § 18.2. These variations at times create problems unique to a state's legislative design. In Oregon's case, the combination of the supermajority quorum requirement and a part-time legislative session makes walkouts peculiarly disruptive. As the district court found, the compelled-attendance provision notwithstanding, Oregon's "legislature has been intermittently paralyzed by walkouts."

Oregon voters recognized the need to secure the attendance of legislators with new incentives. They thus turned to a potent tool of direct democracy—the constitutional initiative—to address a problem that strikes at the heart of its representative democracy: the failure of its legislature to legislate. Or. Const. art. IV, § 1 ("reserv[ing] to the people" the right to legislate through initiative and referendum). The initiative's "invention . . . was in full harmony with the Constitution's conception of the people as the font of government power." *Ariz.*

10

*State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 819 (2015). Oregon in particular has a venerable history of direct democracy. It was "the first State to adopt the initiative as a means, not only to enact ordinary laws, but also to amend the State's Constitution." *Id.* at 794. Oregon has used the initiative nearly four-hundred times in the last century, the highest among all states in the Union. Jeffrey S. Sutton, *Who Decides?* 354 (2022). It is the people's work-around to a recalcitrant legislature. The alacrity and ability of Oregon's citizens to amend their own state constitution is a hallmark of our tradition of representative democracy. "Constitutions say who is in charge. Amendments remind politicians that it is not them. The capacity to change a constitution respects a truth in any democracy, that the people hold the ultimate reins on power." *Id.* at 333. Measure 113 is the federalist system in action.

To be sure, the Senators' primary complaint is with Oregon's chosen mechanism—disqualification—rather than the notion that States might recur to other processes by which they can secure a quorum. But a state's power to regulate the qualifications for state office "is a decision of the most fundamental sort for a sovereign entity." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). The Supreme Court has reiterated as "obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be exclusive, and free from external interference, except so

far as plainly provided by the Constitution of the United States." *Id.* (quoting *Taylor v. Beckham*, 178 U.S. 548, 570–71 (1900)).

This is not merely an academic detour. These federalism principles reify Oregon's significant interest in securing the sound functioning of its legislature. They are also instructive in the narrow-tailoring analysis below. Although the Constitution is doubtlessly an outer limit on the States' authority to establish qualifications for their own legislators, "our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives." *Id.* at 462 (citation omitted); *accord Shooter v. Arizona*, 4 F.4th 955, 963 (9th Cir. 2021). "This rule 'is no more than . . . a recognition of a State's constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders.'" *Gregory*, 501 U.S. at 462 (alteration in original) (citation omitted).

B

With those guiding principles in mind, I turn now to the narrow-tailoring prong of our precedents on content neutrality. Importantly, we do not require a content-neutral regulation to be "the least speech-restrictive means of advancing the Government's interests." *Doe*, 772 F.3d at 577 (citation omitted). Instead, "the test is whether the means chosen . . . burden[s] substantially more speech than is

12

necessary to further the government's legitimate interests." *Id.* (alterations in original) (citation and quotation marks omitted).

Application to the Senators of Article IV, § 15 does not burden substantially more speech than necessary, for at least two reasons. First, disqualification leaves open the most important channels of expression. During the session, the Senators could have exercised their right under the Oregon Constitution, as legislators, "to protest, and have [their] protest, with [their] reasons for dissent, entered on the journal [of the Senate]." Or. Const. art. IV, § 26. They could have spoken to reporters or their constituents any time they were not required to be in session. They could have issued a press release. The possibilities are endless, so long as they are physically present when required by the Oregon Constitution. Whatever additional expressive value the Senators find in a walkout is beside the point, because "[t]he guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Menotti*, 409 F.3d at 1155 (quoting *Greer*, 424 U.S. at 836). Even setting those alternatives aside, Oregon's Constitution does not invariably foreclose the Senators' preferred mode of expression; the Senators could have walked out in protest nine times before facing disqualification.

Second, other compulsion-of-attendance procedures—which the Senators concede would not violate the First Amendment—are, at least to my mind, more

13

speech restrictive than disqualification.  Physically compelling the presence of the Senators would necessarily terminate the very walkout that the Senators claim is protected.  The Senators also concede that Oregon could imprison them for their absence as a punishment, not merely as a corrective mechanism to achieve their attendance.  *See Kilbourn v. Thompson*, 103 U.S. 168, 189–90 (1880).  If Oregon may lawfully imprison absent lawmakers as punishment, it may, a fortiori, impose the less restrictive civil disability of disqualification.  Disqualification from re-election comes with no additional penalties; as citizens, the former senators retain all of their First Amendment rights to criticize the Oregon Legislative Assembly.  The Senators nevertheless press that disqualification is more speech-restrictive than imprisonment because it prospectively forecloses their direct access to the legislative forum.  But the First Amendment grants them no unqualified entitlement to their office.  And, for the reasons explained in our per curiam opinion, any expressive conduct available only by dint of their office is not protected by the First Amendment.

III

For the foregoing reasons, I conclude that the Senators' claim that their personal right to protest shields them from disqualification under Article IV, § 15 of the Oregon Constitution is unlikely to succeed on the merits.  Although these arguments were ultimately meritless, I feel the parties deserve due consideration of

14

each of their claims.  For the reasons expressed in our per curiam opinion and in this concurrence, I join the panel in concluding that the district court did not abuse its discretion in denying the Senators' motion for a preliminary injunction.

FILED

*Linthicum v. Wagner*, 23-4292

FEB 29 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BRESS, Circuit Judge, concurring:

Today's per curiam opinion correctly and sufficiently resolves this case under *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 (2011). *Carrigan* is clear that legislators have no First Amendment speech rights in a "governmental act" that constitutes part of the exercise of "legislative power." *Id.* at 126, 128. Applying that rule of law to a state legislator's claimed First Amendment right to vote over and above a Nevada conflict-of-interest recusal rule, the Supreme Court in *Carrigan* concluded that "[e]ven if it were true that the vote itself could 'express deeply held and highly unpopular views,' the argument would still miss the mark" because "[t]his Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message." *Id.* at 127 (citation omitted). Thus, "a legislator has no right to use official powers for expressive purposes." *Id.*

*Carrigan* answers this case because the Senators here claim a First Amendment right not to attend legislative sessions where their non-attendance either precludes a legislative quorum or threatens that result. Even if this act could have expressive connotations, as in *Carrigan*, it is a "governmental act" that is part of the exercise of "legislative power"—the attempted "use [of] governmental mechanics to convey a message," for which the Senators receive no First Amendment protection. *Id.* at 126–28.

1

In addition, like in *Carrigan*, a substantial historical tradition supports the conclusion that the Senators here have no underlying First Amendment right to their claimed expression. In *Carrigan*, that history consisted of long-accepted legislative recusal rules. *See id.* at 122–24. Here, as the per curiam opinion describes, we have a long and constitutionally enshrined history of rules allowing legislatures to compel the attendance of absent members. That legislators can be compelled to return to the seat of power, even to the point of imprisonment, shows they have no personal First Amendment right to be absent.

Judge Bybee's separate concurring opinion goes considerably further, believing that more analysis is needed to show that the Senators' personal right to free speech was not infringed. That journey into uncharted First Amendment waters is unnecessary and rests on an incomplete understanding of *Carrigan*. The Senators' asserted personal right here is inconsistent with *Carrigan*, which makes clear that "[t]he legislative power thus committed is not personal to the legislator but belongs to the people." *Id.* at 126. Judge Bybee's concurring opinion thus engages with a hypothetical personal right that the Supreme Court has said does not exist.

In the process, that concurrence takes a broader view of the ability of states to curtail what it assumes would be state legislators' otherwise protected speech. The concurrence states that *Carrigan* "stands for the proposition that a State may incidentally burden the personal First Amendment rights of state legislators when

the exercise of such rights would disrupt the functioning of the legislature."  But
*Carrigan* does not support that far-reaching proposition.  *Carrigan* holds that certain
acts which are governmental in nature and inhere in the "legislative power" are not
among the personal rights of individual legislators, so that legislators have no
personal First Amendment claim to them.  *Carrigan* is not about the permissible
burdening of personal First Amendment rights, but about whether there are such
rights in the first place (making clear that for official legislative acts, there are not).

The Nevada recusal rule in *Carrigan* did also prevent any legislator with a
conflict of interest in the proposal from "advocat[ing] the passage or failure" of that
initiative, which *Carrigan* regarded as a permissible time, place, and manner
restriction.  *Id.* at 121–22.  But on this point, the Supreme Court was careful to treat
the prohibition on advocacy of a legislative proposal as "evidently meaning
advocating its passage or failure *during the legislative debate*."  *Id.* at 121 (emphasis
added).  With that cabined understanding, *Carrigan* had little difficulty concluding
that such a restriction was permissible: "[l]egislative sessions would become
massive town-hall meetings if those who had a right to speak were not limited to
those who had a right to vote."  *Id.*; *see also id.* ("Neither Carrigan nor any of his
*amici* contend that the prohibition on advocating can be unconstitutional if the
prohibition on voting is not.").

But to say that someone without a vote cannot participate in formal legislative

debates is a far more straightforward constitutional issue than the one Judge Bybee's concurrence poses and then endeavors to answer, which involves the application of First Amendment scrutiny to a state constitutional amendment that in this case results in Senators being disqualified from office for acts of political protest. Under *Carrigan*, there is no need to engage with this more involved question because legislators have no First Amendment right to deprive their legislature of a quorum, however expressive this act of protest may be. But if one is to go ahead and (unnecessarily) assume the existence of a counter-*Carrigan* personal First Amendment right, as Judge Bybee's concurrence does, I think the matter would require more consideration than the concurrence lets on.

Emphasizing principles of federalism and deference to state processes announced in cases outside the First Amendment context, the concurrence relies heavily on "Oregon's considerable interest in ensuring the sound functioning of the state legislature," as well as the state's related interest in avoiding the disruption of the legislative process. These interests are stated at a very high level. The concurrence also compares state legislators to other public employees, such as air traffic controllers, and finds Oregon's approach narrowly tailored because the Senators have other avenues of communication. I question whether this analysis appropriately accounts for the real risks attendant to actual speech restrictions of legislators. If we were truly dealing with a personal First Amendment right (again,

we are not), more scrutiny would be warranted. We do not accept the argument that ensuring the "sound functioning" of society justifies the suppression of unpopular views. The "sound functioning of the state legislature" should provide no greater justification for unlawful restrictions on speech, especially political speech that the First Amendment so highly values.

The fear that legislative processes could inflict First Amendment harm on legislators is not merely hypothetical. Our recent decision in *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) allowed an Oregon state Senator's First Amendment claim to proceed because he plausibly alleged First Amendment retaliation for political speech made in a legislative context. As today's per curiam notes, the Supreme Court in *Carrigan* was careful to distinguish between a legislator performing a legislative act and a legislator engaging in political speech in a legislative setting: "A legislator voting on a bill is not fairly analogized to one simply discussing that bill or expressing an opinion for or against it. The former is performing a governmental act as a representative of his constituents; only the latter is exercising personal First Amendment rights." *Carrigan*, 564 U.S. at 128 n.5 (internal citation omitted).

It is this critical distinction from *Carrigan* between official legislative acts and personal speech that drives the resolution of this case. Broader suggestions that otherwise protected legislator speech may be suppressed under more forgiving

standards to ensure a better functioning legislature raise much more difficult questions.  We had no need to tackle those issues because under *Carrigan*, no personal First Amendment right is implicated here.  That is why the per curiam opinion correctly and appropriately stops where it does.